Brekk presented no opinion on the matter at trial. She testi-fied generally that she had looked into an elementary school in Gretna, but she never indicated that she wanted Cohen to attend school there.

The evidence shows that the parties agreed to move to Lincoln and resided there together until they separated, at which point Brekk moved to Gretna. Troy has a developing law practice in Lincoln, while Brekk has no employment tying her to Gretna. In fact, Brekk acknowledged that there was no reason she could not relocate to Lincoln. Given these facts, we find that there is a greater potential for permanency in Lincoln, as opposed to Gretna.

Because the parties could not agree on where Cohen would attend school, the court made the decision that it was in Cohen's best interests to attend school in Lincoln, and the court allowed Troy to determine which specific school Cohen would attend. We find no abuse of discretion in this decision.

## VI. CONCLUSION

The district court did not err in determining that removal of the children from Nebraska to Utah would not be in the children's best interests and that it would be in Cohen's best interests to attend school in Lincoln. We affirm the district court's judgment in all respects.

Affirmed.

───────────────

In re Interest of Seth K. and Dinah K.,
children under 18 years of age.
State of Nebraska, appellee, v.
Deborah P., appellant.
___ N.W.2d ___

Filed September 2, 2014.    No. A-14-002.

1. **Juvenile Courts: Evidence: Appeal and Error.** Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion inde-pendent of the juvenile court's findings. When the evidence is in conflict, how-ever, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other.

2. **Parental Rights: Evidence: Proof.** A court will terminate a parent's natural right to the custody of his or her child when the two requirements of Neb. Rev. Stat. § 43-292 (Cum. Supp. 2012) have been met: First, there must be clear and convincing evidence of one of the conditions prescribed in subsections (1) through (11) of § 43-292, and second, there must be an additional showing that termination of parental rights is in the child's best interests by clear and convincing evidence.

3. **Evidence: Proof: Words and Phrases.** Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proven.

4. **Parental Rights: Words and Phrases.** A termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights; therefore, given such severe and final consequences, parental rights should be terminated only in the absence of any reasonable alternative and as the last resort.

5. **Parent and Child.** The law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child.

Appeal from the Separate Juvenile Court of Douglas County: Douglas F. Johnson, Judge. Reversed and remanded for further proceedings.

Anne E. Troia, P.C., L.L.O., for appellant.

Donald W. Kleine, Douglas County Attorney, and Amy Schuchman for appellee.

Inbody, Chief Judge, and Irwin and Bishop, Judges.

Irwin, Judge.

## I. INTRODUCTION

Deborah P. appeals from the order of the juvenile court which terminated her parental rights to her two children. On appeal, Deborah challenges the juvenile court's findings that her parental rights should be terminated pursuant to Neb. Rev. Stat. § 43-292(2) (Cum. Supp. 2012) and that termination of her parental rights is in the children's best interests. Upon our de novo review of the record, we reverse the juvenile court's order which terminated Deborah's parental rights. We do not find clear and convincing evidence that termination of Deborah's parental rights is in the children's best interests.

## II. BACKGROUND

These juvenile court proceedings involve two children: Seth K., born in July 2009, and Dinah K., born in December 2010. Deborah is the children's biological mother. The children's biological father, Matthew K., is not a party to this appeal. His parental rights to both children were terminated by the juvenile court during previous proceedings. As such, Matthew's involvement in the children's lives will be discussed only to the extent necessary to provide context.

The current juvenile court proceedings were initiated in March 2013. However, this is not the first time that the family has been involved in the juvenile court system. The family's history with the juvenile court is relevant to the current proceedings because such history provides insight into Deborah's ability to independently parent the children. As a result, we briefly recount that history here.

In September 2009, Seth, who was then about 2 months old, was removed from Deborah and Matthew's home after Matthew admitted to subjecting Seth to inappropriate physical contact which resulted in a fracture to Seth's arm and bruising on his ankles. As a result of Matthew's actions and Deborah's failure to protect Seth from Matthew's actions, Seth was adjudicated as a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) and placed in foster care. While the juvenile court proceedings were still pending, Dinah was born. Immediately after her birth, Dinah was removed from Deborah and Matthew's custody and placed in foster care with Seth.

Shortly after Dinah's birth, the juvenile court terminated Matthew's parental rights to both Seth and Dinah. At this time, Deborah and Matthew were, apparently, no longer residing together. The juvenile court and the Department of Health and Human Services (the Department) continued to assist Deborah in obtaining reunification with the children. Deborah was provided with various services, including those of a family support worker, individual therapy, parenting classes, domestic violence classes, and supervised visitation with the children.

In April 2012, Seth and Dinah were returned to Deborah's home, and a few months later, in September 2012, the juvenile court case involving the family was closed. At that time, Deborah declined any further services from the Department to assist her with the children.

In January 2013, approximately 4 months after the previous juvenile court case was closed, the Department received information that Deborah's home was unsanitary and inappropriate for the children. Department workers visited Deborah's home and observed that the house was very dirty and cluttered and had a strong odor. In addition, the workers observed a baggie of marijuana on Deborah's couch. This baggie was within the reach of Seth and Dinah. Deborah admitted to the workers that she was struggling and needed help caring for the children. She also admitted that she used marijuana on a daily basis.

As a result of the condition of Deborah's home and her admission that she was struggling, the Department created a safety plan to assist Deborah. As a part of this plan, the children were temporarily placed in the care of their paternal grandparents while Deborah cleaned up her home. A few days later, after Deborah cleaned the home, Seth and Dinah were returned to Deborah's care. At that point, Deborah agreed to allow the children's paternal grandparents to assist her in taking care of the children and agreed to participate in such services as intensive family preservation, a pretreatment assessment, and a chemical dependency evaluation.

Shortly after this safety plan was initiated, Deborah was evicted from her home due to nonpayment of rent. A new safety plan was then created. Deborah and the children moved in with the children's paternal grandparents. Deborah agreed that she would continue to voluntarily participate in services to assist her with her parenting and with her substance abuse problem.

In March 2013, Deborah was asked to leave the home of the children's paternal grandparents because the grandparents believed that she was not properly caring for the children when she was not working. Deborah would not get up

with the children in the mornings and often would not come home on the weekends after her work shift ended. Deborah left the home, but Seth and Dinah remained with their grandparents.

On March 20, 2013, the State filed a petition alleging that the children were within the meaning of § 43-247(3)(a) due to the faults or habits of Deborah. Specifically, the petition alleged that the children were at risk for harm because of, among other things, Deborah's use of alcohol or controlled substances and Deborah's failure to provide safe, stable, or appropriate housing.

After the petition was filed, the juvenile court entered an order continuing the children's placement outside of Deborah's home. The children remained in the home of their paternal grandparents. In this same order, the court "invited" Deborah to voluntarily participate in the following services: supervised visitation with the children, parenting classes, intensive outpatient substance abuse treatment, random drug testing, family support, and a psychological evaluation.

On April 29, 2013, the State filed an amended petition. This petition again alleged that the children were within the meaning of § 43-247(3)(a) due to the faults or habits of Deborah. However, the amended petition also alleged provisions concerning termination of Deborah's parental rights to Seth and Dinah. Specifically, the amended petition alleged that the children were within the meaning of § 43-292(2) because Deborah had substantially and continuously or repeatedly neglected and refused to provide the children necessary parental care or protection and that termination of Deborah's parental rights was in the children's best interests.

A hearing on the State's amended petition began in August 2013 and continued in December. During the first portion of the hearing, the State presented its case about Deborah's parenting abilities and her minimal efforts to achieve reunification with the children. Then, 4 months later, during the second portion of the hearing, Deborah presented her case about the recent progress she had made toward reunification and about her bond with the children.

## 1. STATE'S EVIDENCE

During the August 2013 hearing, the State presented evidence to demonstrate that Deborah was not making sufficient efforts to take care of herself or improve her circumstances and, as such, was not making sufficient efforts to obtain reunification with the children.

The State presented evidence that between March and August 2013, Deborah did not make any effort toward managing her substance abuse or mental health issues. She did not enroll in any type of treatment program, she did not participate in an individual therapy program, she did not participate in a Narcotics Anonymous group, and she was not compliant with drug testing. In fact, the State offered evidence to indicate that during this period of time, on the few occasions that Deborah had submitted to a drug test, she tested positive for marijuana four times. Deborah stopped submitting to any drug tests in June 2013.

The State presented evidence that at the time of the August 2013 hearing, Deborah was not employed. In fact, there was evidence that Deborah had lied to the Department workers about having employment, when she was actually unemployed. In August 2013, Deborah was living with her boyfriend and his two children in a two-bedroom apartment. The family's caseworker testified that this housing was problematic for two reasons: First, there was "no room for" Seth and Dinah to live there with Deborah. Second, Deborah did not want the Department to perform a background check on her boyfriend, so the children were not permitted to have any contact with him.

The State presented evidence that initially, in March 2013, Deborah did not want to participate in supervised visitations with the children. Deborah indicated that she did not have time for such visitations and that she did not want to see the children if someone was going to be watching her. There was also evidence that when Deborah did decide to participate in visitations, she managed the children appropriately for short periods of time; however, she could not care for the children for longer periods of time.

The Department caseworker testified that during their lives, both Seth and Dinah had spent more time in foster care than they had with Deborah. The caseworker also opined that Deborah was in a worse place in August 2013 than she had been in when the case was initiated in March 2013.

## 2. Deborah's Evidence

In December 2013, Deborah presented evidence that she had made beneficial progress toward achieving reunification with the children and that she had a strong bond with the children.

Deborah's evidence revealed that during the fall of 2013, she successfully completed an intensive outpatient treatment program for her substance abuse. Deborah's treating therapist testified that Deborah attended and actively participated in her program. In addition, Deborah completed a relapse prevention program and passed all of the drug tests given to her during the program. The same therapist testified that Deborah's prognosis was "excellent."

Deborah also presented evidence to demonstrate that by the time of the December 2013 hearing, she had acquired full-time employment. This employment provided Deborah with benefits.

Finally, Deborah presented evidence that she had successfully completed a parenting class in August 2013 and that her parenting skills had improved after that class. Visitation workers who supervised visits between Deborah and the children testified that Deborah was attentive to the children and would develop and implement age-appropriate activities for the children during visits. Deborah also had appropriate meals and "supplies" for the children, and the children appeared to love Deborah very much. Both Seth and Dinah were happy to see Deborah during visits, and Deborah was very affectionate with them.

At the close of all the evidence, the juvenile court entered an order finding that "all counts of the amended petition" filed herein "are true . . . by clear and convincing evidence." The court adjudicated Seth and Dinah to be within the meaning of § 43-247(3)(a) as a result of the faults or habits of Deborah.

The court also found that Seth and Dinah were within the meaning of § 43-292(2) and that termination of Deborah's parental rights was in their best interests. The court then terminated Deborah's parental rights to Seth and Dinah.

Deborah appeals from the juvenile court's order.

## III. ASSIGNMENTS OF ERROR

On appeal, Deborah challenges the juvenile court's finding that her parental rights should be terminated pursuant to § 43-292(2) and the court's finding that termination of her parental rights is in the children's best interests.

## IV. STANDARD OF REVIEW

[1] Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Jagger L.*, 270 Neb. 828, 708 N.W.2d 802 (2006). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id*.

## V. ANALYSIS

[2,3] A court will terminate a parent's natural right to the custody of his or her child when the two requirements of § 43-292 have been met. See *In re Interest of Crystal C.*, 12 Neb. App. 458, 676 N.W.2d 378 (2004). First, there must be clear and convincing evidence of one of the conditions prescribed in subsections (1) through (11) of § 43-292, and second, there must be an additional showing that termination of parental rights is in the child's best interests by clear and convincing evidence. See *In re Interest of Crystal C., supra*. Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proven. See *In re Interest of Jagger L., supra*.

In this case, the juvenile court determined that both of the requirements of § 43-292 had been met. The court found that Seth and Dinah were within the meaning of § 43-292(2) because Deborah had substantially and continuously or repeatedly neglected and refused to give them necessary parental

care and protection. The court also found that termination of Deborah's parental rights was in the children's best interests.

On appeal, Deborah asserts that both of these findings of the juvenile court were in error. We first address her assertions concerning whether the juvenile court erred in determining that termination of her parental rights was in the children's best interests, because our ultimate resolution of this issue is dispositive of Deborah's appeal.

Deborah asserts that the juvenile court erred in determining that termination of her parental rights was in the best interests of the children. Specifically, Deborah argues that she has made progress toward reunification with the children, that she has a strong bond with the children, and that she is willing to continue to work to become a better parent.

Upon our review of the record, we conclude that Deborah's assertions have merit. We find insufficient evidence to demonstrate that terminating Deborah's parental rights to Seth and Dinah is in the children's best interests. As such, we reverse that portion of the juvenile court's order which terminated Deborah's parental rights to these two children.

[4,5] A termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights; therefore, given such severe and final consequences, parental rights should be terminated only in the absence of any reasonable alternative and as the last resort. See, *In re Interest of Justin H. et al.*, 18 Neb. App. 718, 791 N.W.2d 765 (2010); *In re Interest of Crystal C., supra*. The law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id.*

The current juvenile court proceedings were initiated in March 2013 when the State filed a petition alleging that the children were within the meaning of § 43-247(3)(a) as a result of the faults or habits of Deborah. However, 1 month after the initial petition was filed and before the children could even be adjudicated pursuant to that petition, the State filed an amended petition which included allegations that Deborah's parental rights should be terminated. Four months after the

amended petition was filed, the hearing on the amended peti-
tion began. The hearing was both an adjudication proceeding
and a termination proceeding.

At the August 2013 hearing, the State presented evidence
that since March 2013, when the initial petition was filed,
Deborah had not made sufficient efforts toward achieving
reunification with the children. Deborah had not made any
effort toward managing her substance abuse or mental health
issues. Specifically, she had not enrolled in a treatment pro-
gram, she had not participated in therapy, and she was not com-
pliant with requested drug testing. Deborah was not employed
and did not have suitable housing for the children. Deborah
also exhibited an inability to appropriately care for Seth and
Dinah for extended periods of time.

During the State's case, it conceded that because Seth and
Dinah had not yet been adjudicated at the time of the August
2013 hearing, Deborah's participation in any of the services
offered to her was entirely voluntary. She had not yet been
ordered by the court to participate in any specific rehabilita-
tion plan.

The hearing on the amended petition continued in December
2013. At that time, Deborah presented evidence that she
had made substantial progress toward achieving reunifica-
tion with the children and that she had a strong bond with
the children. Deborah presented evidence that during the fall
of 2013, she successfully completed an intensive outpatient
treatment program for her substance abuse. As a part of
that program, Deborah cooperated with and passed regular
drug tests. Deborah's prognosis for maintaining her sobriety
was considered "excellent." Deborah had obtained full-time
employment, and such employment provided Deborah with
benefits. In addition, Deborah had completed a parenting
class in August 2013 and was successfully applying the les-
sons she learned from this class to her interactions with Seth
and Dinah. Visitation workers who supervised visits between
Deborah and the children testified that Deborah was good
with the children, always had fun activities for the three of
them to engage in together, and always provided the children
with appropriate food and other supplies. In addition, these

workers observed a bond between Deborah and the children. The children appeared to enjoy spending time with Deborah, and the family members exhibited a lot of affection with each other.

Clearly, the evidence presented by Deborah at the December 2013 portion of the hearing is in stark contrast to the evidence presented by the State at the August portion of the hearing. The reason for such a disparity in the evidence appears to be due to Deborah's failure to make sufficient efforts toward reunification in the early stages of the juvenile court proceedings. However, we must note that only 5 months passed between the filing of the initial petition and the August hearing. And, we must also note that during those 5 months, Deborah's participation in any sort of rehabilitation plan was considered voluntary. As such, we find Deborah's situation distinguishable from those cases where last-minute attempts by parents to comply with a rehabilitation plan did not prevent termination of parental rights. See, e.g., *In re Interest of Kassara M.*, 258 Neb. 90, 601 N.W.2d 917 (1999) (last-minute efforts of mother were not sufficient to prevent termination where 2½ years passed between initial rehabilitation plan order and termination proceedings); *In re Interest of V.M.*, 235 Neb. 724, 457 N.W.2d 288 (1990) (last-minute efforts of mother were not sufficient to prevent termination where child had been in out-of-home placement for over 2½ years).

When we view as a whole the evidence presented at both the August and December 2013 portions of the hearing, we conclude that Deborah has made notable progress toward achieving reunification with the children. She has made active efforts toward taking care of herself and improving her circumstances and, in addition, has made efforts to improve her parenting skills and her relationship with the children. Deborah clearly loves the children, and the children love Deborah.

In its brief on appeal and during oral arguments, the State dismissed Deborah's recent efforts toward reunification as inconsequential because Deborah has exhibited a pattern of making progress when she is involved with the juvenile court and then reverting back to harmful behavior once there is

no longer court involvement. Clearly, the State's argument references the previous juvenile court proceedings involving Deborah and the children. During that previous case, Deborah successfully achieved reunification with Seth and Dinah, but then, approximately 4 months after the case was closed, the Department began receiving reports that Deborah was neglecting the children. The State argues that Deborah is simply unable to sustain the progress she has made when not under the constant supervision of the juvenile court.

We recognize that "'one's history as a parent speaks to one's future as a parent.'" See *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 908, 782 N.W.2d 320, 328 (2010). However, one's history does not alone determine his or her future. Deborah's past involvement with the juvenile court system is relevant to her ability to appropriately and effectively parent the children and, accordingly, relevant to the children's best interests. Nevertheless, in this case, we do not find that Deborah's past history with the juvenile court is dispositive of her future as a parent.

There is no evidence to suggest that the improvements Deborah has made during the pendency of the current juvenile court proceedings are only temporary in nature. Deborah's prognosis for maintaining her sobriety is considered excellent. She worked to obtain stable, full-time employment. And, after completing her parenting class, she has consistently utilized positive and appropriate parenting skills with the children. Deborah appears motivated and committed to achieving and maintaining reunification with the children. We cannot assume that she will revert to her previous, harmful behaviors if given the chance simply because this has happened once before. As we stated above, we cannot turn a blind eye to the severe consequences of finally and completely severing a child from the parent. See *In re Interest of Crystal C.*, 12 Neb. App. 458, 676 N.W.2d 378 (2004).

We appreciate that Deborah still has work to do before achieving reunification with Seth and Dinah. In particular, we point to the need for Deborah to obtain appropriate and safe housing and the requirement that she demonstrate the ability to maintain her sobriety and stability. However, we do not

require perfection of a parent when deciding whether termination of parental rights is appropriate.

We conclude that there is insufficient evidence to prove that termination of Deborah's parental rights to Seth and Dinah is in the children's best interests. We reverse that portion of the juvenile court's order which terminated Deborah's parental rights to Seth and Dinah.

## VI. CONCLUSION

We find that the juvenile court erred when it found that the State had proven, by clear and convincing evidence, that terminating Deborah's parental rights would be in Seth's and Dinah's best interests. Accordingly, we reverse that portion of the juvenile court's order which terminated Deborah's parental rights and remand the matter for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.